[Dkt No. 59, 60]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

---

DAVID and DIANE DAUTRICH,

     Plaintiffs,

          v.

NATIONSTAR MORTGAGE, LLC, and
SAFEGUARD PROPERTIES
MANAGEMENT, LLC,

     Defendants.

Civil No. 15-8278

**OPINION**

---

APPERANCES:

NORTHEAST LAW GROUP, LLC
By:  Adam Deutsch, Esq.
P.O. Box 60717
Longmeadow, MA 01106
        Counsel for Plaintiffs

TROUTMAN SANDERS LLP
By:  Kyle D. Deak, Esq.
     Stephen J. Steinlight, Esq.
     Amanda Lyn Genovese, Esq.
875 Third Avenue
New York, NY 10022
        Counsel for Defendant Nationstar Mortgage LLC

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
By:  Christopher B. Block, Esq.
425 Eagle Rock Avenue
Suite 302
Roseland, NJ 07068

and

GOLDBERG SEGALLA, LLP
By:  Elizabeth Anne Chang, Esq.
900 Carnegie Boulevard West

Suite 100
Princeton, NJ 08540
          Counsel for Defendant Safeguard Properties

**BUMB, UNITED STATES DISTRICT JUDGE:**

This matter comes before the Court upon Defendant

Nationstar Mortgage LLC's ("Nationstar") Motion for Summary

Judgment and Plaintiffs David and Diane Dautrich's Cross Motion

for Summary Judgment on Counts 2 and 3 of the Complaint.  For

the reasons set forth below, the Court will grant in part and

deny in part Nationstar's motion, and deny the Dautrichs'

motion.[1]

I.    **Facts and Procedural History**

At all relevant times, the Dautrichs have owned a five

bedroom, four and a half bathroom, oceanfront second home in

Stone Harbor, New Jersey.  (Plaintiffs' Response to Defendant's

Statement of Undisputed Facts ¶¶ 4, 9)  The house's fair market

value is approximately 2.9 to 3.6 million dollars.  (Id. ¶ 8)

It is undisputed that in July 2012, when Defendant

Nationstar took over servicing the Dautrichs' mortgage on the

Stone Harbor property[2], the Dautrichs were already in default.

---

[1]  The Court exercises federal question subject matter
jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental
jurisdiction pursuant to 28 U.S.C. § 1367.

[2]  The mortgage is secured by an adjustable rate note in the
amount of 1.5 million dollars.  (Plaintiffs' Response to
Defendant's Statement of Undisputed Facts ¶ 5)

(Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 5)  Nationstar's first letter to the Dautrichs advising them of the servicing change reflects that, as of July 15, 2012, the Dautrichs' monthly mortgage payment was $11,122.83, their principal balance was $1,480,682.89, and the escrow balance was $0.00. (David Dautrich Cert. Ex. 2)

Once loans are in default, Nationstar "maintains protocols to inspect the property at least once a month." (Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 15) While the precise legal relationship between Nationstar and Defendant Safeguard Properties ("Safeguard")[3] is presently unclear, it is undisputed that Safeguard inspected the Dautrichs' Stone Harbor property on a monthly basis beginning in October, 2013 through March, 2014. (Deutch Cert. ¶ 3)[4]

Based on an inspection performed on February 27, 2014, Safeguard concluded that the property was "vacant but maintained." (Deutch Cert. Ex. 7)  On March 4, 2014, Safeguard

---

[3]  By Orders dated March 5, 2018, and upon stipulation of the parties, all claims and crossclaims against Safeguard were dismissed.  Safeguard has been terminated as a party to this suit.

[4]  The parties may dispute whether Safeguard is an "independent subcontractor" for Nationstar.  (Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 15)  That issue, however, has not been briefed by either party.  Accordingly, for the purposes of the instant motions only, the Court assumes without deciding that Nationstar may be held liable for actions taken by Safeguard.

sent a work order to Four Corners Management directing Four
Corners to change the locks and winterize the property. (Id.
Exs. 8-9) The Dautrichs assert that during the course of
changing the locks and winterizing the property, the front door
doorjam was "damaged," the custom-made back door was "damaged,"
the custom-made crawlspace door was "dented and scratched," and
the water heater was improperly drained without turning off the
electricity which caused the water heater to burn out. (David
Dautrich July 7, 2017 Dep. p. 25-41) The Dautrichs also assert
that inspection stickers were placed on granite and porcelain
surfaces in the house. (Id. p. 42)

David Dautrich discovered that the locks had been changed
on the house sometime in "late March or early April 2014."
(David Dautrich July 7, 2017 Dep. p. 22) The record does not
disclose exactly what happened after it was determined that the
Dautrichs had not abandoned the house; David Dautrich testified
that he and his wife were still able to rent out the house
without a decrease in the rental value. (Id. p. 41)

A few months later, in a letter dated July 28, 2014,
Nationstar sent the Dautrichs a proposed Loan Modification
Agreement. (David Dautrich Cert. Ex. 4) The proposed
modification was a two year *reduction of the interest rate* and a
*two year interest-only monthly payment of $5,612.42.* (Id.)
(emphasis added). The letter stated that "to take advantage of

this opportunity you must" sign the agreement before a notary and return the signed, notarized agreement with "your initial payment of $14,398.38."[5]  (Id.)  Significantly, the letter also stated that, "[t]his offer to modify your loan expires on 31JUL2014."  (Id.)

David Dautrich testified that he received the letter in the evening of July 29th or 30th, and called Nationstar the next day to tell them that he was interested in a loan modification but that it would be "impossible" to perform in such a short period of time.  (David Dautrich Dec. 8, 2016 Dep. p. 39)[6]  Dautrich further testified that he told Nationstar's representative, "Joe", that Dautrich and his wife "want[ed] to back everything up 30 days" so that they could have enough "time to get the money together."  (Id. p. 42)  It is undisputed that "Nationstar agreed to change the date upon which the qualifying payment and Loan Modification Agreement had to be returned executed." (Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 28)

---

[5]  The parties refer to this payment as the "Qualifying Payment." The Court will do so as well.

[6]  Dautrich testified that Nationstar "had requested . . . that the[] documents be executed and returned with a qualifying payment [to Nationstar in Texas] by July 31st of 2014.  We obviously couldn't do that because we didn't get the documents themselves until a day or two before that."  (David Dautrich Dec. 8, 2016 Dep. p. 49)

In a letter to Nationstar dated August 1, 2014, David Dautrich memorialized his telephone conversation with Nationstar concerning the proposed modification:

Dear Ms. Drake:

Late in the evening on July 30, 2014, we received the package from Nationstar with the enclosed Letter Acknowledgement, Loan Modification Agreement and the Agreement to Maintain Escrow Account. Obviously, we could not return those documents, along with a check in the amount of $14,398.38 ("Qualifying Payment") by July 31, 2014, as Nationstar's letter requested.

Therefore, I called to speak with you from my attorney's office today, August 1, 2014, and requested that the temporary modification offered documents be extended until August 28, 2014. Nationstar Employee No. 8972096, Joe, said he received authority to extend Nationstar's modification offer to August 28, 2014. That said, my wife and I will be signing the three documents referenced above and returning them to Nationstar via FedEx, along with our check in the amount of $14,398.38. I understand from speaking to Joe, No. 8972096, that any foreclosure proceedings will be withdrawn and halted and this is, essentially, a new start, at least for the two years during which the loan modification will be in effect.

I would still appreciate an explanation from you as to how our initial payment of $14,398.38 was computed and, also, an explanation as to how those proceeds will be applied to our obligation.

You will be receiving our check in the amount of $14,398.38 ("Qualifying Payment"), along with our signed and properly notarized Loan Modification Agreement and Agreement to Maintain Escrow Account by the extended date of August 28, 2014 via FedEx.

(Steinlight Cert. Ex. I)

Around August 28, 2014, the Dautrichs delivered to Nationstar a check in the amount of $14,398.38 and executed copies of the documents Nationstar included in its July 28th letter. (Plaintiffs' Response to Defendant's Statement of

Undisputed Facts ¶ 31)[7]  Importantly, however, the Dautrichs

changed material terms of the proposed Loan Modification

Agreement before they executed it:

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of September 1, 2014, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $1,598,600.57, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of 4.213%, from August 1, 2014 until August 1, 2016. Borrower promises to make monthly payments of interest of U.S. $5,612.42, beginning on September 1, 2014, and continuing thereafter on the same day of each succeeding month until September 1, 2016 (the "Interest Only Period"). After expiration of the Interest Only Period, the amount of Borrower's monthly payments may change in accordance with the terms of the original Note. Borrower will continue to make monthly payments on the same day of each succeeding month until principal and interest are paid in full, except that, if not sooner paid, the final payment of principal and interest shall be due and payable on the 01AUG2035, which is the Maturity Date.

3. If on the Maturity Date, Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

(Dautrich Cert. Ex. 4)  It is undisputed that Nationstar never

executed the altered Loan Modification Agreement.  (Plaintiffs'

Response to Defendant's Counterstatement of Undisputed Facts ¶

32)  Nationstar deposited the Dautrichs' check into their

"suspense account" and did not credit any of the money towards

---

[7]  Nationstar asserts that it did not receive the check and executed documents until August 29, 2014.  The Dautrichs dispute this assertion.  The one-day difference, however, is not material to the Court's legal analysis.  As set forth infra, even if the Court assumes that Nationstar received the check and documents by the August 28, 2014 deadline, summary judgment in favor of Nationstar is still warranted.

the loan at issue.  (Plaintiffs' Response to Defendant's Counterstatement of Undisputed Facts ¶ 33)[8]

On September 16, 2014, approximately two weeks after Nationstar maintains that the Dautrichs' next mortgage payment was due, Nationstar commenced a foreclosure proceeding against the Dautrichs.  (Plaintiffs' Response to Defendant's Counterstatement of Undisputed Facts ¶ 36)[9]  Sometime around this time, the Dautrichs sent Nationstar another check in the amount of $5,612.42.  (Clopton Dep. p. 60-61, 70-71)  Like the Qualifying Payment check, Nationstar deposited the $5,612.42 check into the suspense account and did not credit any of the money toward the Dautrichs' loan.  (Plaintiffs' Response to Defendant's Counterstatement of Undisputed Facts ¶ 33)

In the following months, David Dautrich continued to send Nationstar checks in the amount of $5,612.42, interest-only payments under the Loan Modification Agreement.  (Dautrich Cert. Ex. 7)  Each time Nationstar received a check, it returned the check to the Dautrichs with a letter explaining why the check

---

[8]  Nationstar's Fed. R. Civ. P. 30(b)(6) witness testified that a "suspense account" is "a holding account" for funds which "ha[ve] not been applied to the . . . balance owed on the loan." (Clopton Dep. p. 52)

[9] After this lawsuit was filed, Nationstar voluntarily dismissed the foreclosure suit.  (Id. ¶ 37)

was being returned.  (Id.)  In total, Nationstar sent twelve

such letters.  Eleven letters state:

Dear Mr/Mrs Borrower:

At Nationstar Mortgage, we strive to keep our customers informed on matters relating to their loans.

We recently received a payment on your behalf in the amount of $5612.42.  We are returning these funds as they are insufficient to bring your account current.

As of the date of this letter, the total amount required to bring this account current is $99999.99. Account statuses are subject to change.  Please contact us for up-to-date account information and amounts owed.

(Dautrich Cert. Ex. 7; Plaintiffs' Response to Defendant's

Statement of Undisputed Facts ¶ 40)  A twelfth letter is

identical to the other letters except that it states "[w]e

recently received a payment on your behalf in the amount of

$1,000.00."  (Defendant's Response to Plaintiffs' Statement of

Undisputed Facts ¶ 25)  Each of the twelve letters is

undisputedly erroneous insofar as the amount required to bring

the Dautrichs' loan current at all times greatly exceeded

$99,999.99.  (Id. ¶ 31)[10]  As discussed further _infra_,

Nationstar asserts that the erroneous $99,999.99 figure resulted

from a computer "glitch" which prevented dollar amounts

---

[10]  Nationstar calculated that as of September 2015, the amount required to bring the loan current was $236,665.82.  (Clopton Dep. p. 81)

exceeding seven digits from being auto-populated in the letters.[11]

The Complaint asserts six counts: (1) breach of the Loan Modification Agreement; (2) violation of the Fair Debt Collection Practices Act, "FDCPA", 15 U.S.C. § 1692e; (3) violation of the New Jersey Consumer Fraud Act, "NJCFA", N.J.S.A. 56:8-2; (4) violation of the Truth in Lending Act, "TILA", 15 U.S.C. § 1639f(a); (5) violation of the Real Estate Settlement Procedures Act, "RESPA", 12 U.S.C. § 2605(f); and (6) "property tortiously damaged."

In response to Nationstar's Motion for Summary Judgment, Plaintiffs state in their opposition brief, "Plaintiffs withdraw/dismiss their claim for relief under the Truth in Lending Act set forth under Count IV of the Complaint." (Opposition Brief, p. 1)  Accordingly, the Court will dismiss the TILA claim (Count 4) pursuant to Fed. R. Civ. P. 41(a)(2).

## II.  **Summary Judgment Standard**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if it might impact the

---

[11]  The Dautrichs make no separate claim based on the one letter which erroneously states that the Dautrichs sent Nationstar a check in the amount of $1000.

"outcome of the suit under the governing law." Gonzalez v. Sec'y of Dept of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Walsh v. Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315,

318 (3d Cir. 2009).  "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate."  Id.  In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.  Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.").  However, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

## III. Analysis

### A. Breach of the Loan Modification Agreement

Nationstar moves for summary judgment on the breach of contract claim (Count 1) arguing[12]: (1) "a contract was never formed with respect to the Loan Modification Agreement because

---

[12]  The Court observes that one may advance a legal "argument" without being overly argumentative or discourteous.  In this regard, counsel for both parties are encouraged to be mindful of the manner in which they advocate for their clients' respective

Plaintiffs made a counteroffer with new terms, namely a modified payment schedule, which Nationstar never accepted." (Moving Brief, p. 22), and alternatively, (2) even if a contract was formed, the Dautrichs breached the contract by failing to pay escrow charges.[13]  In opposition, the Dautrichs argue, (1) "[t]here is a legitimate question of fact as to whether Nationstar's August 1 adjustment of the deadline to submit the qualifying payment and executed Modification also included an adjustment to the first monthly payment of $5,612.42 from September 1 to October 1," (Opposition Brief, p. 6); and (2) Nationstar failed to disclose "what escrow was owed." (Id. p. 9)

The record evidence that Nationstar agreed to push back the first modified loan payment of $5,612.42 from September 1 to October 1 is exceedingly thin.  David Dautrich's deposition testimony concerning his telephone conversation with a Nationstar representative on August 1 is muddled at best.  Three times during David Dautrich's deposition, Dautrich was specifically asked whether Nationstar agreed to push back the

---

positions to ensure that their arguments maintain an appropriate level of courtesy.  Here, the briefs are unnecessarily nasty.

[13]  Nationstar also argues that a contract was never formed because the Dautrichs missed-- by one day-- the extended deadline for returning the loan modification documents.  The Court does not reach this argument.

due date of the first payment, and each time Dautrich failed to directly answer the question.[14]

> First, Dautrich was asked:
>
> Q: So you are saying that Nationstar told you that you could handwrite in these edits to the modification?
>
> A: Yes.
>
> Q: They explicitly said the modification would begin on October 1, 2014?
>
> A: Say that again.
>
> Q: Nationstar agreed that the payments would begin on October 1 not September 1 as written in the loan modification agreement?
>
> A: I told them I can't make the payment – I believe I got that letter – the cover letter showed up on my porch either 28th or the 29th. I said I need – I can't- I can't- I need to confer with an attorney. I need to get the money together. I need another 30 days. So is it all right if I back everything up 30 days. The guy – Joe—he gave me an employee number. He did not have the authority. He said he would have to confer with a supervisor. He conferred with a supervisor and then came back and said this is going to be okay. It's a loan modification. You have a fresh start for two years. And then I breathed a sigh of relief. Those were his words: "You have a fresh start for two years." That to me was clear and unambiguous.

(Dautrich Dec. 8, 2016 Dep. p. 39-40)

> Next, he was asked:
>
> Q: And Nationstar agreed to allow you to skip the September payment?

---

[14] As Nationstar points out, David Dautrich's failure is noteworthy given the undisputed evidence that Dautrich is an experienced litigator with real estate transaction experience.

> A: Later when they complained about it, I offered to send the extra payment. I said if some reason that's now an issue for you, I'll send the extra payment in. They refused to accept that.

(Id. p. 41)

> Lastly, he was asked:

> Q: What led you to believe that the start date could be moved from September to October?

> A: Because if everything got pushed back 30 days, September, I changed everything, I moved everything 30 days down the road. I changed September 1st to October 1st. I changed September 1st to October 1st. . . . It didn't appear to be a concern to them at that point. I thought – and when it did come to my attention that they were complaining that I was a month behind, I said all right, I will send the extra payment, then that will cure that, and that wasn't acceptable.

(Id. p. 55)[15]

Viewing the summary judgment record, as the Court must, in the light most favorable to the Dautrichs, the Court finds that the Dautrichs have just barely raised a material issue of fact as to whether Nationstar agreed to push back the start date to October 1st. Dautrich testified that he asked to "back everything up 30 days" and that Nationstar's representative "said this is going to be okay." (Dautrich Dec. 8 Dep. p. 39-

---

[15] Similarly, David Dautrich testified that he "recall[ed]" asking Nationstar to change the start date, but Dautrich did not testify that Nationstar agreed to such change: "Q: When you asked that everything be . . . pushed back 30 days, did you explicitly ask that the modification start in October instead of September? A: As I recall, I did." (Dautrich Dec. 8, 2016 Dep. p. 43)

14

40)  While a factfinder might conclude that Nationstar's
representative was only referring to pushing back the due date
of the Qualifying Payment (or that Dautrich himself was not
referring to the start date during the telephone conversation[16]),
a reasonable factfinder might also find that "this is going to
be okay" did include an agreement to push back the September 1
start date to October 1.  Thus, the Court holds that a
factfinder could reasonably find that both the Dautrichs and
Nationstar agreed to all material terms of the Loan
Modification, including an October 1st start date, and therefore
a contract was formed.

    Nonetheless, summary judgment is still warranted for
Nationstar.  Even if a factfinder found that a contract was
formed, the undisputed record evidence demonstrates that the
Dautrichs immediately breached the Loan Modification when they
failed to make their escrow account payment.  Indeed, the
Dautrichs admit that, at during the relevant time period, they
never paid any money towards escrow.  (Plaintiffs' Response to
Defendant's Statement of Undisputed Facts ¶ 34-35)  They argue,
however, that they did not know, and "could not determine," how
much was due for escrow.  (Plaintiffs' Opposition Brief, p. 9)

---

[16]  As Nationstar observes, Dautrich's letter to Nationstar
memorializing the telephone conversation omits any reference to
changing the September 1 date. (Steinlight Cert. Ex. I)

This argument is insufficient to defeat summary judgment, and is contrary to the record.

First, as a matter of law, ignorance of the terms of a contract does not excuse a breach of the contract.  Second, no reasonable factfinder could conclude on this record that, under the terms of the Loan Modification Agreement, the Dautrichs reasonably believed that they owed nothing towards escrow; nothing in the Loan Modification documents supports a conclusion that the Dautrichs owed no escrow money.

To the contrary, the record establishes that Nationstar's modification offer included: (1) a one-page cover letter setting forth "the basic terms of [the] modification," and how the Dautrichs could accept the offer; (2) a one-page "Letter Acknowledgement" setting forth the amount of the Qualifying Payment ($14,398.38) and explaining how that money would be applied; (3) a two-page "Loan Modification Agreement" setting forth the amount of the interest-only loan payments ($5,612.42); and (4) a one-page "Agreement to Maintain Escrow Account." (Dautrich Cert. Ex. 4)[17]

---

[17]   The pagination of the documents makes clear that the documents were intended as a complete package; the cover letter is "Page 1 of 5," the Letter Acknowledgement is "Page 2 of 5," the Loan Modification Agreement is Pages 3 and 4 of 5, and the Agreement to Maintain Escrow Account is "page 5 of 5." (Dautrich Cert. Ex. 4)

The title of the fourth document alone-- "Agreement to Maintain Escrow Account"-- indicates that the Dautrichs' escrow payments were expected to continue after the modification, and the contents of the document confirm this conclusion.   The agreement states, "Borrower agrees to pay Lender, on the day Periodic Payments are due under the Note, . . . a sum to provide for payment of amounts due for: . . . taxes and assessments . . . . premiums for any and all insurance required by Lender . . . and "Mortgage Insurance Premiums."  (Dautrich Cert. Ex. 4)

Most significantly, however, the Dautrichs themselves submit a "Mortgage Payoff Statement" dated October 8, 2014-- i.e., seven days after the Dautrichs contend the Loan Modification Agreement became effective-- reflecting that the Dautrichs, at that time, owed $2,0077.50 as an "Escrow Payment." (Dautrich Cert. Ex. 5)[18]  Yet, the next check the Dautrichs sent to Nationstar-- which is also the first check Nationstar returned to the Dautrichs-- is an October 27, 2014 check for $5,612.42 (i.e., the exact amount to cover solely the interest-only payment, leaving nothing for escrow). (Dautrich Cert. Ex. 7)  Thus, the undisputed record evidence demonstrates that, assuming the parties agreed to the Loan Modification Agreement, the Dautrichs breached that agreement when they sent the October

---

[18]  The Statement also reflects that Nationstar had paid $18,150.04 in "Escrow Advances."  (Dautrich Cert. Ex. 5)

27, 2014 check which included no funds for escrow. Therefore, as a matter of law, any breach Nationstar allegedly committed when it failed to credit that money (and all other subsequent checks) towards the Dautrichs' loan was excused. See City of Trenton v. Cannon Cochran Mgmt. Servs., Inc., 2011 WL 3241579, at *4 (App. Div. 2011) ("A party in breach of contract cannot rely on the other party's subsequent failure to perform to excuse its own prior breach.") (citing Nolan v. Lee Ho, 120 N.J. 465, 472 (1990), and Restatement (Second) of Contracts § 237).

Thus, as to the breach of contract claim, the Dautrichs have failed to carry their summary judgment burden of raising a genuine issue of disputed fact as to whether they failed to pay their escrow obligations, and whether such failure was a material breach of the Loan Modification Agreement. Even if a reasonable factfinder could find that both parties mutually assented to all material terms of the Loan Modification Agreement (including the October 1 start date, as the Dautrichs assert), that same factfinder could only find on this record that the Dautrichs breached the Loan Modification Agreement almost immediately after the contract was formed. Therefore, as matter of law, the alleged subsequent breaches by Nationstar were excused. Nationstar's Motion for Summary Judgment as to Count 1 will be granted.

**B.  FDCPA**

It is undisputed that Nationstar's letters which accompanied the Dautrichs' returned checks were false and that 15 U.S.C. § 1692e prohibits false representations made in connection with the collection of a debt.[19]  Two issues are presented: (1) does the FDCPA apply to Nationstar's attempts to collect on a loan secured by a property which undisputedly is not the Dautrichs' primary residence? (2) is Nationstar entitled to the FDCPA's "bona fide error" defense, 15 U.S.C. § 1692k(c)? The Court addresses each in turn.

(1)  Applicability of the FDCPA

The FDCPA applies to attempts to collect on debts "arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).  Nationstar argues that the Dautrichs' beach house is an investment property and therefore the mortgage on the property is not a debt incurred primarily for personal, family, or household purposes.

---

[19]  "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . (2) The false representation of-- (A) the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

The record evidence does not support Nationstar's position. The undisputed fact that the Dautrichs sometimes rent out their beach house[20] is not irreconcilably inconsistent with their use of the house primarily for personal, family, or household purposes.

Moreover, the "Second Home Rider" to the mortgage at issue states in relevant part,

> Borrower shall occupy, and shall only use, the Property as Borrower's second home.  Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires the Borrower to rent the Property or give a management firm or any other person any control over the occupancy or use of the property.

(Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 7)  This evidence also supports a finding that the debt at issue was incurred primarily for personal, family, or household purposes.

The Court holds that the FDCPA applies; Nationstar's Motion for Summary Judgment as to this issue will be denied.[21]

---

[20]  David Dautrich testified that the "property is a second home that's also rented . . . . in June, July, August, September, and maybe part of October."  (Dautrich Dec. 8, 2016 Dep. p. 22); see also Merkle Dep. p. 56 ("Q: How many weeks per year does the property typically get rented?  A: It can vary between 12 and 16 weeks.").

[21]  In passing, Nationstar also asserts that the Dautrichs cannot establish a FDCPA claim because "the false reinstatement amount was such a small fraction of what Plaintiff [sic] owed to be

(2)  <u>The bona fide error defense</u>

The issue is whether Nationstar is entitled to the "bona

fide error" defense, 15 U.S.C. § 1692k(c).  Nationstar moves for

summary judgment asserting that it is; the Dautrichs move for

summary judgment asserting that it is not.

The statute provides, "[a] debt collector may not be held

liable in any action brought under this subchapter if the debt

collector shows by a preponderance of evidence that the

violation was not intentional and resulted from a bona fide

error notwithstanding the maintenance of procedures reasonably

adapted to avoid any such error." 15 U.S.C.A. § 1692k(c).  "[T]o

avail itself of the defense, [the debt collector must]

establish: (1) the alleged violation was unintentional, (2) the

_____

reinstated, it could not be considered material such that it
would alter the decision-making process of the least
sophisticated debtor." (Moving Brief, p. 26; see also Opposition
Brief, p. 27)  In support of this assertion, Nationstar cites
<u>Gordon v. Bank of America, N.A.</u>, 2017 WL 1377673 at *4 (D.N.J.
2017), which held that "while likely false and erroneous," a
$390.00 total charge for 26 property inspections "could not be
considered material" when it was undisputed that a "total [of]
$221,906.10 [was] due on the mortgage."  <u>Gordon</u> is
distinguishable; the erroneous figure at issue here--
$99,999.99-- far exceeds $390.  <u>See</u> <u>generally</u> <u>Jensen v. Pressler</u>
<u>& Pressler</u>, 791 F.3d 413, 421 (3d Cir. 2015) ("a statement in a
communication is material if it is capable of influencing the
decision of the least sophisticated debtor.  As our
jurisprudence in this area has shown, this is not a particularly
high bar. . . . [T]he materiality requirement, correctly
applied, effectuates the purpose of the FDCPA by precluding only
claims based on hypertechnical misstatements under § 1692e that
would not affect the actions of even the least sophisticated
debtor.").

alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors." Beck v. Maximus, Inc., 457 F.3d 291, 297-98 (3d Cir. 2006).

As to the second prong-- the existence of a bona fide error-- the undisputed record establishes that the $99,999.99 figure originated from a computer program glitch. (Plaintiffs' Response to Defendant's Counterstatement of Undisputed Facts ¶ 42)[22] This is the type of "clerical . . . mistake[]," Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 587 (2010), to which the bona fide error defense may apply.[23] Likewise, the failure of Nationstar's employees to identify and correct the computer glitch upon review of the computer-generated letter is a clerical mistake to which the defense may apply. Accordingly, the Court holds that Nationstar has carried its burden of establishing the second prong of the defense.

---

[22] See Clopton Dep. p. 67 ("Q: . . . there's a paragraph that says, as of the date of this letter, the total amount required to bring this account current is $99,999.99. A: Yes. Q: Is that accurate? A: No. That's [an] error due to a glitch with the form, with this particular . . . template."); p. 74 ("Q: So the cause for the error is that the program could not put a number greater than 99,999.99? A: At that time, yes. The tool had a glitch. And so the form fields were not reading and it was not picking up.").

[23] Jerman held that the bona fide error defense does not apply to a violation resulting from a debt collector's mistaken interpretation of the legal requirements of the FDCPA. 559 U.S. at 577.

As to the first prong-- the intent prong-- the statute requires that the violation of the FDCPA "not [be] intentional." 15 U.S.C.A. § 1692k(c).  Stated another way, the statutory bona fide error defense may be available to the debt collector unless the debt collector acted with intent to violate the FDCPA.  See Rush v. Portfolio Recovery Assocs. LLC, 977 F. Supp. 2d 414, 440 (D.N.J. 2013) ("while the Third Circuit has not directly addressed the issue, I note that district courts in this circuit, as well as other circuit courts, focus their intent inquiry on whether the debt collector intended to violate the FDCPA, not whether it intended to communicate, or attempted to communicate.") (internal citations omitted); cf. Jerman, 559 at 582–83 ("Our law is . . . no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law.").[24]

---

[24]   The Dautrichs quote Allen ex rel. Martin v. LaSalle Bank, N.A., which states, "[t]he FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation."  629 F.3d 364, 368 (3d Cir. 2011). Allen-- which did not involve the bona fide error defense-- is entirely consistent with the above-cited cases.  The FDCPA does impose liability "without proof of an intentional violation" because, as the statute itself states, the bona fide error defense is an affirmative defense for which the debt collector bears the burden of proof.  15 U.S.C.A. § 1692k(c).  In other words, a plaintiff need not prove the debt collector's intent to establish liability; nonetheless, the debt collector may be excused from its FDCPA violation if it can prove all three elements of the bona fide error defense.

Contrary to the Dautrichs' assertion (see Opposition Brief, p. 16), Nationstar does submit evidence that it did not intend to misrepresent the amount required to bring the Dautrichs' mortgage current; it is not genuinely disputed that the $99,999.99 figure originated from a computer program glitch. (Plaintiffs' Response to Defendant's Counterstatement of Undisputed Facts ¶ 42)  Nevertheless, the Dautrichs observe that "[t]he 'error' was not merely a computer system issue," (id.), and urge the Court to infer from the following undisputed evidence that Nationstar intentionally failed to correct the error.  First, each letter undisputedly was reviewed by a Nationstar employee before it was sent, and each time (i.e., twelve consecutive times) the error was not corrected. (Defendant's Response to Plaintiffs' Statement of Undisputed Facts ¶ 30)

Second, Nationstar undisputedly continued to use the faulty computer program even after the glitch was discovered, for a period of approximately six months-- November 2014 to April 2015-- while Nationstar attempted to fix the issue. (Clopton Dep. p. 75, 77-78)  The Court holds that this evidence sufficiently supports submitting to a jury the issue of Nationstar's intent.  A reasonable juror could conclude that Nationstar's repeated conduct of sending twelve erroneous letters in a row-- four of which undisputedly are dated after

24

Nationstar asserts that it fixed the glitch[25]-- is evidence that Nationstar intentionally failed to correct the $99,999.99 error.

Similarly, the Court holds that a jury should decide whether Nationstar's "procedures [were] reasonably adapted to avoid any such error." 15 U.S.C.A. § 1692k(c). In this regard, it is clear that the "error" the Dautrichs assert is not the generation of the $99,999.99 figure in the first instance, but rather, the failure of Nationstar's employees to identify and/or correct the erroneous figure, even after the computer glitch was detected. (Plaintiffs' Reply Brief, p. 9) Nationstar's representative's testimony as to this third prong is rather vague; Clopton testified that "[w]e just received notice in general that there were issues with the tool and to be careful when using it because it was producing some errors with the figures it was giving." (Clopton Dep. p. 78) A jury should evaluate the reasonableness of Nationstar's response, or lack of response, as the case may be.

Accordingly, with regard to the FDCPA claim (Count 2), Nationstar's Motion for Summary Judgment will be denied, and the Dautrichs' Motion for Summary Judgment will be denied.

---

[25] Defendant's Response to Plaintiffs' Statement of Undisputed Facts ¶¶ 25-28 (letters dated May 30, 2015; June 27, 2015; August 3, 2015; and October 2, 2015).

### C. NJ CFA

According to the Dautrichs, Nationstar engaged in an "unconscionable" business practice in violation of the New Jersey Consumer Fraud Act because "no contractual clause under the terms of the original mortgage loan or modification, and no statute or regulation [] permitted Nationstar to hold $20,020.80 of Plaintiffs' money in an unapplied funds suspense account." (Moving Brief, p. 23)  "Once accepted," the Dautrichs explain, "Nationstar was obligated to apply the funds as of the date received, in the manner set forth within the [original mortgage] contract." (Id. p. 25-27)

At most, this argument asserts that Nationstar breached the original mortgage contract, and as Nationstar correctly observes, a mere breach of contract, without more, is not actionable under the NJ CFA.  See Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) ("a breach of warranty, or any breach of contract, is not per se unfair or unconscionable . . . and a breach of warranty alone does not violate a consumer protection statute. . . . Because any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present

26

in addition to the breach."). Moreover, the Dautrichs have not established that the original mortgage's provisions concerning application of funds survived their undisputed default on the loan. In other words, the summary judgment record does not even establish that Nationstar breached any contract, much less that any such breach was accompanied by aggravating circumstances that would give rise to a NJ CFA claim.

Accordingly, as to the CFA claim (Count 3), the Dautrichs' Motion for Summary Judgment will be denied, and Nationstar's Motion for Summary Judgment will be granted.

**D. RESPA**

The Dautrichs assert that Nationstar violated RESPA by sending them the loan modification offer dated July 28, 2014 which required that the Dautrichs except the offer by July 31, 2014. RESPA's implementing regulations require that a servicer give a borrower at least 14 days to "accept or reject an offer of a loss mitigation option." 12 C.F.R. § 1024.41(e)(1).

Nationstar asserts that the undisputed record is clear that it gave the Dautrichs more than 14 days to accept the proposed loan modification; the parties do not dispute that when David Dautrich called Nationstar, Nationstar "agreed to change the date upon which the qualifying payment and Loan Modification Agreement had to be returned executed," extending it to August

27

28, 2014. (Plaintiffs' Response to Defendant's Statement of Undisputed Facts ¶ 28).

The Dautrichs respond that "[t]he extension of time was non-compliant because RESPA requires loss mitigation offers to be in writing and Nationstar never confirmed in writing that Mr. and Mrs. Dautrich could extend the time to accept the Modification." (Opposition Brief, p. 29) In support of this assertion, the Dautrichs cite 12 C.F.R. § 1024.41(c)(1)(ii) which states that "a servicer shall . . . [p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage."

The undisputed record demonstrates that Nationstar complied with § 1024.41(c)(1)(ii); the Loan Modification offer was in writing. Nothing in the regulation requires that extensions of the § 1024.41(e)(1) 14-day minimum deadline be in writing.

Moreover, to the extent that the intent of the regulations is to ensure that the borrower receives adequate notice of a servicer's decisions, there can be no dispute that the Dautrichs were well-aware that Nationstar extended the due date for the Loan Modification documents. David Dautrich's August 1st letter states, "I called . . . and requested that the temporary modification offered documents be extended until August 28, 2014. Nationstar employee No. 8972096, Joe, said he received

28

authority to extend Nationstar's modification offer to August 28, 2014." (Steinlight Ex. I)

Accordingly, Nationstar's Motion for Summary Judgment as to the RESPA claim (Count 5) will be granted.

**E. "Property tortiously damaged"**

Lastly, Nationstar asserts that the economic loss doctrine bars the Dautrichs' claim which essentially asserts that their house was negligently damaged when the locks were changed. This argument fails.

"At common law a plaintiff who had a contractual relationship with the defendant was able to sue in tort if the plaintiff could establish that the alleged breach of duty constituted a separate and independent tort." Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 309, 788 A.2d 268, 276 (2002). Such is the case at bar. While the parties' relationship was, indeed, created by contract, nothing in the parties' contract contemplated that Nationstar would damage the Dautrichs' house while changing the locks. In this way, contrary to Nationstar's argument, Nationstar did have an independent duty extrinsic to the parties' contract; "an independent legal duty to refrain from damaging [the Dautrichs'] property." Lacroce v. M. Fortuna Roofing, Inc., No. CV 14-7329 (JBS/KMW), 2017 WL 6342150, at *5 (D.N.J. Dec. 12, 2017) (denying defendants' motion for summary judgment, holding that the economic loss doctrine did not bar

29

the plaintiff's negligence claim); contrast Saltiel, 170 N.J. at 310 ("there is no general duty to exercise reasonable care to avoid intangible economic loss[es] . . . *that do not arise from tangible physical harm to persons and tangible things*.") (emphasis added).  In asserting their claim for property damage, the Dautrichs are not merely "seek[ing] the benefit of the bargain they made in their agreement" with Nationstar, Saltiel, 170 N.J. at 312, and thus the economic loss doctrine does not apply.

Accordingly, Nationstar's Motion for Summary Judgment as to the "property tortiously damaged" claim (Count 6) will be denied.

## IV.  Conclusion

For the forgoing reasons: (a) Nationstar's Motion for Summary Judgment will be granted as to Counts 1 (breach of contract), 3 (NJ CFA), and 5 (RESPA) of the Complaint, and denied as to Counts 2 (FDCPA) and 6 ("property tortiously damaged") of the Complaint; (b) the Dautrichs' Cross-Motion for Summary Judgment will be denied; and (c) Count 4 (TILA) of the Complaint will be dismissed pursuant to Fed. R. Civ. P. 41(a)(2).  An appropriate Order shall issue.


June 29, 2018                    __s/ Renée Marie Bumb _____
                                RENÉE MARIE BUMB
                                UNITED STATES DISTRICT JUDGE